# Pennsylvania Railroad Company, Bedford & Bridgeport Railroad Company, and Pennsylvania Company, Appts., *v.* Commonwealth of Pennsylvania.

### (Three cases combined.)

A corporation authorized to make purchases and sales of and investments in the bonds and securities of other companies contracted for the purchase of a controlling interest in the stock and securities of a projected line of railroad, the consideration coming from another railroad company. The projected railroad had a traffic contract with a connecting railroad by which the former, when completed, would become a parallel or competing line with the railroad furnishing the consideration. The consideration was to be the guarantied bonds of an insolvent railroad company. The corporation in whose name the contract of purchase was made did not own or control a line which would be parallel or competing with the projected railroad. A preliminary injunction was issued after the securities were purchased and delivered to a party negotiating the transfer, but before they came into the hands of the stockholders. The injunction restrained the projected road from delivering the stock or securities, the other road from issuing or delivering the guarantied bonds, and the railroad company furnishing the consideration or guaranty, from guaranteeing the bonds or obtaining in any manner the control of the stock, franchises, and property of the projected line. On review the decree continuing the preliminary injunction was affirmed.

### (Decided October 4, 1886.)

Cited in United States v. Northern Securities Co. 120 Fed. 726, holding that interstate trade and commerce is restricted by a combination whereby the stock of two railroad companies operating parallel and competing lines is transferred to a corporation organized for the purpose of holding and voting the same; in Stockton v. Central R. Co. 50 N. J. Eq. 52, 17 L. R. A. 107, 24 Atl. 964, holding invalid a lease by one railroad company of the franchise and road of another; in Central Iron Works v. Pennsylvania R. Co. 2 Dauphin Co. Rep. 312, holding art. 17, § 4 of the Constitution self-executing; in Gummere v. Lehigh Valley R. Co. 3 Maxwell, 241, 261.

NOTE.—Article 17, § 4, of the Constitution prohibits any railroad or

Appeal from a decree of the Common Pleas of Dauphin County, in equity, continuing a preliminary injunction.   Affirmed.

Reported below, 1 Pa. Co. Ct. 214.

The facts are stated in the opinion of the court below, by SIMONTON, P. J,:

"This is a suit brought by the attorney general, in the name of and on behalf of the commonwealth of Pennsylvania, for the purpose of obtaining an injunction to restrain the Pennsylvania Railroad Company from obtaining and exercising control of the South Pennsylvania Railroad Company.   The theory of the case is that the acts sought to be enjoined are prohibited by § 4 of article 17 of the Constitution of 1874.   On the filing of the bill a preliminary injunction was awarded.   Afterward, on the application of the attorney general, an examiner was appointed to take testimony to be used on the hearing of a motion to continue the injunction.   A large mass of testimony was taken and filed, the motion was elaborately and ably argued, and we are now to determine whether the injunction is to be dissolved or to be continued until the final hearing.

"The substance of the case made by the bill is that the Pennsylvania Railroad Company and the South Pennsylvania Railroad Company own and control parallel or competing lines of railroad; that the former corporation is about to obtain and exercise control of the latter, and that it is prohibited from so doing by the section of the Constitution above referred to, which ordains as follows:   'No railroad, canal or other corporation, or the lessees, purchasers, or managers of any railroad or canal corporation, shall consolidate the stock, property, or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control, any other railroad or canal cor-

canal company from leasing or purchasing the works or franchises of any parallel or competing line.   This does not apply to the acquirement by a street railway company of a road operating on a parallel street (Gyger v. Philadelphia City Pass. R. Co. 136 Pa. 96, 9 L. R. A. 369, 20 Atl. 399) ; or to the building by a railroad of a line parallel with a line already acquired (Catawissa R. Co. v. Philadelphia & R. R. Co. 168 Pa. 544, 32 Atl. 62).   See also editorial note to State *ex rel.* Nolan v. Montana R. Co. 45 L. R. A. 271, presenting the authorities as to consolidation of competing or parallel lines.

poration owning or having under its control a parallel or competing line; nor shall any officer of such railroad or canal corporation act as an officer of any other railroad or canal corporation owning or having the control of a parallel or competing line. . . .'

"The facts are substantially these: The Pennsylvania Railroad Company is a corporation of this state, and controls and operates, partly as owner and partly as lessee, a line of railroad extending between New York and Chicago, by way of Philadelphia, Harrisburg, Pittsburg, and points farther west, constituting one of the so-called great 'trunk lines' of railroad between the seaboard and the west. The railroads west of Pittsburg forming part of this line are operated by the Pennsylvania Company, a corporation of this state, all the stock of which is owned by the Pennsylvania Railroad Company, except what is necessary to qualify directors.

"The South Pennsylvania Company is also a corporation of this state, and has authority to construct a line of railroad between Harrisburg and a place known as Port Perry, in the county of Allegheny, on the Youghiogheny river, through the counties of Cumberland, Franklin, Fulton, Bedford, Somerset, and Westmoreland. At Port Perry its line connects with the line of the Pittsburgh, McKeesport, & Youghiogheny Railroad Company, with which company it has a traffic contract, giving it access to Pittsburg. It has also traffic contracts with companies owning connecting railroads east of Harrisburg and west of Pittsburg, which make it virtually part of a trunk line between New York and Chicago, by way of Philadelphia, Harrisburg, and Pittsburg. Its route is substantially parallel to the Pennsylvania Railroad; and when completed and in operation it would be a line parallel to and competing with the lines of the Pennsylvania Railroad Company for freight and passenger traffic originating or terminating at Philadelphia, Harrisburg, or Pittsburg. No part of its line has been completed; over $5,000,000 have been expended in the work of construction, which is about one fourth the sum necessary to complete the work.

"The American Construction Company is a corporation which has contracted to construct the road.

"As the result of negotiations carried on during the early summer of 1885, on the one side by Mr. George B. Roberts, president, and Mr. Frank Thomson and Mr. John P. Green, vice presidents of the Pennsylvania Railroad Company (Mr. Roberts being at the same time president of the Pennsylvania Company), and on the other side by a Mr. Morgan, a banker of New York, on behalf of such of the stockholders of the South Pennsylvania Railroad Company as might affirm his action, a formal proposition in writing, signed by Mr. Roberts as president of the Pennsylvania Company, was made to Mr. Morgan, the substance of which is that Mr. Morgan would 'procure by purchase and legal assignment and transfer to such persons' as should be designated by Mr. Roberts, 'the securities and contracts and control of the South Pennsylvania enterprise as follows, namely: "First, valid and outstanding certificates of subscription to the South Pennsylvania syndicate, so called, to an amount not less than 60 per cent of the total issue thereof." "Second, the entire capital stock of the American Construction Company." "Third, an assignment of all the capital stock, bonds, and securities of the South Pennsylvania Railroad Company, not represented by the certificates held by the said syndicate, or held by said construction company, which capital stock shall be adequate to insure the control of the corporation of the South Pennsylvania Railroad Company."' Thereupon the Pennsylvania Company would 'cause to be delivered to' Mr. Morgan, 'in exchange therefor, upon the resignation of all the directors and officers of the said South Pennsylvania Railroad and American Construction Companies, and of a majority of the committee of said syndicate, and the substitution in their stead of persons to be indicated' by Mr. Roberts or his nominee, bonds of the Bedford & Bridgeport Company, or of some other company, equal in amount to the sum invested in the enterprise by those assenting to the proposition, bearing interest at the rate of 3 per cent per annum, principal and interest guaranteed by the Pennsylvania Railroad Company; and if 'the bonds or debentures herein proposed to be given should mature, the par

value thereof shall be made good by the Pennsylvania Railroad Company, at its option, either in cash or by furnishing some other valid stock or bonds or debentures of equal par value, and with similar guaranty.'

"This proposition was, as we have stated, signed by Mr. Roberts as president of the Pennsylvania Company; but in it he contracts for the Pennsylvania Railroad Company, and the only party that was to assume any responsibility under it was that company, the Bedford & Bridgeport Railroad Company being utterly insolvent and its bonds, without the guaranty, being worthless.

"The proposition was accepted by Mr. Morgan, and assented to by a sufficient number of those for whom he agreed to act, to make it binding; the securities were delivered to him, but had not come into the hands of the stockholders when the injunction was issued.

"Counsel for defendants earnestly contend that these facts show that the Pennsylvania Company is the party agreeing to purchase the stock and securities and stipulating for the control of the South Pennsylvania Railroad Company. We have carefully considered all the arguments so ably advanced in support of this theory, but we cannot avoid coming to the conclusion that, as argued for the commonwealth, the Pennsylvania Railroad Company is the real party in the transaction. This is clearly shown by the testimony of Mr. Morgan and Mr. Roberts. Morgan testifies that, on his suggesting to Mr. Roberts that 'the thing could be carried through' if the Pennsylvania Railroad Company was prepared to give bonds bearing 3 per cent interest for the amount paid in on the South Pennsylvania stock subscriptions, Mr. Roberts 'doubted the policy or the ability of the Pennsylvania Railroad Company, as such, to buy off or in any way to interfere with what might be rival roads;' whereupon, Morgan 'suggested that there were plenty of corporations that would do it and that would work in harmony with the Pennsylvania.'

"And again he says: 'The only thing that was stipulated was that the security that should be given to the subscribers should bear the absolute guaranty of the Pennsylvania Railroad

Company. As to what company it came from or anything of the kind, that was, of course, immaterial.' And again: 'I addressed Mr. Roberts because I was acting in harmony in trying to get thei road out of the way of the Pennsylvania Railroad Company. It was the Pennsylvania Railroad that was complaining of the construction of the road;' and he assented to the statement that the negotiations were based on this idea.

"And Mr. Roberts states frankly that they came to 'talk about' the Pennsylvania Company, in this negotiation, 'simply because the character of the securities and the condition of the South Pennsylvania Road were such that it would in all probability be beyond the chartered powers of the Pennsylvania Railroad Company to build it or to purchase the securities. . . .' And he answered in the affirmative, without comment or explanation, the following question of the attorney general: 'Therefore, as I understand you, the Pennsylvania Railroad Company was the party to this negotiation; but so far as the details of carrying it out were concerned, and to be within the law, you were to use the name of the Pennsylvania Company, or any other company that you were connected with that you might be able to do?' And he further says that 'for all purposes of the transactions that were then going on, or discussion there had, it would be fair and proper to assume that I was president of, and being conversed with as president of, the Pennsylvania Railroad Company.'

"And, as we have already seen in the letter of August 5, signed by him as president of the Pennsylvania Company, he contracts on behalf of the Pennsylvania Railroad Company that the bonds to be delivered shall bear its guaranty, and that, if the principal of the bonds shall mature, it will replace them or at its option pay them in cash; these being the only two clauses in the contract which involved the giving of anything in value.

"In view of this plain and candid statement of the real facts of the case by the parties themselves, it is impossible, as we have already said, to draw any other inference than that the real party contracting and stipulating for the control of the South Pennsylvania Railroad Company was the Pennsylvania Railroad Company, and that any title to any stock or securities

intended to be held in the name of the Pennsylvania Company was to be a mere naked legal title, to be held in trust. In other words, that the Pennsylvania Railroad Company intended to do in fact what it feared it was forbidden by law to do, and therefore attempted to give the transaction the appearance, in the eye of the law, of being other than it really was. This, of course, cannot avail in a court of equity, which looks at substance without being controlled by form.

"It is further strenuously urged, on behalf of defendants, that even if the Pennsylvania Railroad Company be the real party to the contract, it has not done or stipulated for anything prohibited by the Constitution, for the reason that the purchase of the stock of a 'parallel or competing line' is not among the things prohibited; and the case of Pullman's Palace Car Co. v. Missouri P. R. Co. 115 U. S. 596, 29 L. ed. 502, 6 Sup. Ct. Rep. 194, is cited to sustain the proposition that the ownership of the stock of a corporation does not give control of the corporation.

"We have carefully considered the opinion delivered in that case, which, although not of binding authority upon the state courts, because not deciding a Federal question, is yet, in view of its source, entitled to the highest respect. But we do not think it sustains the position contended for. The decision of the question of control was not called for in the case, which was already decided on another and a fundamental point. But, waiving this, the point decided is, merely, that the ownership of the stock does not necessarily give control of the road. The Chief Justice says, speaking of the stockholding company: 'Practically, it may control the company, but the company alone controls its road.' [115 U. S. 596, 29 L. ed. 502, 6 Sup. Ct. Rep. 194.] This distinction seems very narrow, but it is certainly involved in the conclusion reached, which cannot stand unless it is recognized, for it is too plain to bear argument that the ownership of the stock of a corporation carries with it the control of the corporation. Indeed, this is merely a different way of stating the truism that a corporation is controlled by its stockholders. That they do it through the agency of a board of directors and other officers does not alter the fact.

"All this was well understood by Mr. Roberts, as is shown by the stipulation that the capital stock to be assigned 'shall be adequate to insure the control of the corporation of the South Pennsylvania Railroad Company;' and the intention to control is shown by the condition in the contract that the things to be assigned were 'the securities and contracts and control of the South Pennsylvania Railroad enterprise;' and the further condition that the assignment of the securities and stock should be accompanied by 'the resignation of all the directors and officers of the said South Pennsylvania Railroad and American Construction Companies, and of a majority of the committee of said syndicate, and the substitution in their stead of persons to be indicated by Mr. Roberts or his nominee.' Not only was the South Pennsylvania to be controlled, but also the company having the contract for the construction of its road; and as to this, its entire capital stock was to be obtained, 'free from all debts and contracts of any kind whatever.' This would insure not only control of the Railroad Corporation as it then stood, but also the power to abrogate the contract then held by the construction company for the building of the road.

"We have found as a fact that the line of the South Pennsylvania Railroad Company connects at Port Perry with the line of the Pittsburg, McKeesport, & Youghiogheny Railroad Company, and that it has a traffic contract with that company giving it access to Pittsburg. A line running from Harrisburg to Port Perry could hardly be said to be a 'parallel or competing line' to and with the Pennsylvania Railroad; although if extended from Port Perry to Pittsburg it certainly would be such. But defendants contend that the fact of the traffic contracts ought not to be taken into consideration, and that as the line of the South Pennsylvania does not itself extend to Pittsburg, we must conclude that this corporation does not own or control a parallel or competing line.

"We are unable to adopt this view. The traffic contract gives it the right to use the Youghiogheny road between Port Perry and Pittsburg. Section 1 of article 17 of the Constitution secures it the right to have its cars received and transferred over all railroads in the state with which it may connect; we cannot

doubt that it would in fact compete; and it is competition in fact which the Constitution designs to encourage, as it was competition in fact which the defendants were endeavoring in this case to prevent, and which they knew would occur over this line if it were not ' "taken out" of the railroad situation,' to use Mr. Morgan's expressive phrase.

"But the argument was earnestly pressed upon us that the prohibition of the Constitution applies only to a corporation owning or having under its control a railroad completed and in operation; that in the nature of things there can be no competition in transportation when there is no road over which to transport. The Constitution forbids a railroad corporation to 'in any way control any other railroad . . . corporation having under its control a parallel or competing line,' not parallel or competing railroad; and we cannot doubt that the word 'line' was employed advisedly, in this place, instead of 'road' or 'railroad.' It is the term constantly used to denote the route of an intended railroad. Thus, in § 2, act of February 19, 1849, relating to the assessment of damages for lands taken, it is provided that viewers may be appointed, 'neither of whom shall be residents or owners of property upon or adjoining the "line" of such railroad,' where manifestly the term 'line' is used to designate the surveyed route, and not the completed road, as the view may be had before the road is constructed. So in § 2, act of Congress of July 29, 1866, incorporating the Atlantic & Pacific Railroad Company, the company is authorized 'to take, from the public lands adjacent to the line of road, material of earth, stone, timber, and so forth, for the construction thereof.'

"These are random instances of a use of the term which is so common as to leave no doubt as to its meaning in the clause of the Constitution under consideration. And, understanding this meaning, we are bound to give it due force and effect. If we do not, the purpose of the constitutional convention in enacting the clause, and of the people in ratifying it, might always be and in this case would be entirely defeated. The purpose undoubtedly was to promote competition in railroad traffic. But if a corporation engaged in constructing a competitive road may be controlled by its rival until the road is completed, it would

be entirely within the power of the rival to determine whether that event should ever happen; as of course it never would, when it was the interest of the rival to prevent it, for no company would complete a road to hand it over to a competitor.

"For these reasons we think the proper construction of the phrase, a 'parallel or competing line,' is that it includes a projected road, surveyed, laid out, and in process of construction, as we have found to be the fact in this case; if such road when completed and in operation would actually compete with the road seeking control. Before completion it is 'parallel;' when completed it becomes 'competing.'

"During the argument counsel invoked the aid of the undoubted general principle that the ownership of shares of stock, as of other property, carries with it the legal right to sell, and contended that the owners of the shares of the South Pennsylvania Railroad Company could not legally be restrained from so doing, and that an injunction against the purchaser would have this effect.

"We do not think the principle applies to this case. We are not called upon to express any opinion as to the right of the individual shareholders to sell their several shares bona fide in the open market. This, so far as they are concerned, is an intended sale in combination for the express purpose of enabling them to abandon the rights and duties conferred and imposed upon them by the act incorporating the company, and of putting the control of their corporation into the hands of its rival. This is an act contrary to the public policy of the state, which they have no right to do.

"Indeed, all the parties to this transaction seemed to have failed to appreciate the relations they sustain to the public. A charter is a contract, and a contract must always have two contracting parties, upon each of whom it imposes duties as well as confers rights. The charter of a railroad company especially, while it confers and because it confers rights of the highest kind, imposes corresponding duties. It invests the corporation with part of the sovereignty of the state, the right to take private property for (let it be clearly understood) public use. But if the taking of private property for the purpose of constructing a

railroad upon it is taking it for public use, then the public must have an interest in such use. And such is the case. 'A railroad is a public highway for the public benefit. . . . The public has an interest in such a road when it belongs to a corporation, as clearly as they would have if it were free. . . . The companies may be private but the work they are to do is a public duty; and along with the public duty there is delegated a sufficient share of sovereign power to perform it. The right of eminent domain is always given to such corporations, but the right of eminent domain cannot be used for private purposes. . . . ' Sharpless v. Philadelphia, 21 Pa. 169, 59 Am. Dec. 759.

" 'The right of eminent domain nowhere justifies taking property for a private use. Yet it is a doctrine universally accepted that a state legislature may authorize a private corporation to take land for the construction of such a road, making compensation to the owner. What else does this doctrine mean if not that building a railroad, though it be built by a private corporation, is an act done for a public use? And the reason why the use has always been held a public one is that such a road is a highway, whether made by the government itself or by the agency of corporate bodies.' Olcott v. Fond du Lac County, 16 Wall. 694, 21 L. ed. 388, per Mr. Justice STRONG.

"And the same eminent jurist, when a justice of the supreme court of this state said of an unfinished railroad that 'the commonwealth had a right to demand that all the resources, rights, and credits of the company should be devoted to its completion;' and that the directors of a railroad corporation are 'trustees, in a very just sense, for the commonwealth.' Bedford R. Co. v. Bowser, 48 Pa. 29.

"But, as our purpose here is to show, merely, that the parties to the transaction were not dealing with a purely private matter, we will not pursue this subject further. Nor are we now concerned with the question whether there be power in the courts to compel the construction of a railroad by a corporation which has undertaken it. What we here decide is, simply, that the corporators have no such right to sell their stock as can in any way interfere with the granting of an injunction to prevent a

competing corporation from obtaining control of the corporation charged with the duty of its construction.

"We have not overlooked any of the questions argued by counsel; but in our view the case does not call for the decision of any other than those considered above. The result of the discussion is that the injunction must be continued as to the Pennsylvania Railroad Company, the Pennsylvania Company, and the Bedford & Bridgeport Railroad Company, and dissolved as to the other defendants; and a decree may be drawn accordingly."

A decree was entered January 27, 1886, continuing the injunction until final hearing, enjoining the Pennsylvania Railroad Company from purchasing, directly or indirectly, or obtaining in any manner control of the stock, franchises, and property of the said South Pennsylvania Railroad Company, or in any manner from controlling said stock, property, and franchises; and further that you and they do absolutely refrain from guarantying or in any manner becoming responsible for either principal or interest of any bonds or other obligations of the South Pennsylvania Railroad Company or of any other corporation, etc.; restraining the Bedford & Bridgeport Railroad Company from issuing, or, if issued, from delivering, either directly or through any other corporation or person, any of the above-named mortgage or debenture bonds, or other obligations; and restraining the Pennsylvania Company from delivering, either directly or through any other corporation or person, any of the above-named mortgage or debenture bonds, or other obligations.

The assignment of errors specified the action of the court: (1) In entering the decree of January 27, 1886, against the appellants; (2) in not defining in said decree the meaning of the word "control" used therein; and (3) in seeking by a preliminary injunction to undo what had been completely done before the filing of said bill.

*J. T. Brooks, David W. Sellers, Hall & Jordan, John Scott,* and *Wayne MacVeagh,* for appellants.—The Pennsylvania Company was fully authorized by its charter to make the pur-

chases and perform the acts herein complained of. Act 1870 (P. L. 1025).

Its charter is in nowise affected by the present Constitution, it being a pre-existing corporation. Hays v. Com. 82 Pa. 523.

The right to purchase stock in the South Pennsylvania Railroad Company was a vested right of property. The state could not, without compensation, by any means, whether it be called the adoption of a Constitution or in any other way, take from the Pennsylvania Company this valuable grant. Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. ed. 629; Hays v. Com. 82 Pa. 519.

The power of charging more than the usual rates of interest cannot be taken away. Hazen v. Union Bank, 1 Sneed, 115.

Nor the right to consolidate with other corporations. Zimmer v. State, 30 Ark. 680.

Nor can the right to cumulative voting be given without the consent of the stockholders when, prior to the new Constitution, each share of stock was entitled to one vote. Hays v. Com. 82 Pa. 519.

The amendment of the Constitution of 1838 was a grant to the "legislature" of the power "to alter, revoke, or amend any charter of incorporation hereafter conferred . . . whenever, in their opinion, it may be injurious to the citizens of the commonwealth."

The adoption by the people of the new Constitution does not establish the *casus fœderis,* upon which and which only the change can be made. Hays v. Com. 82 Pa. 523.

The police power is superior to all charters in one sense, but never in the sense of permitting the state under it to take for nothing the property rights of citizens or corporations. Boston Beer Co. v. Massachusetts, 97 U. S. 33, 24 L. ed. 989.

It being legitimate for the legislature to grant such a right to the Pennsylvania Company, it does not fall within the class of cases where the courts have held that as to public morals in regulating the sale of whisky, or gambling, or lotteries, and the like, no legislature can bargain away the power to regulate and even to wholly abolish. Stone v. Mississippi, 101 U. S. 814, 25 L. ed. 1079.

The power of eminent domain is conditioned generally upon compensation to the owner, and for the most part is founded not in calamity or fault, as is the police power, but in public utility. New Orleans Waterworks Co. v. Rivers, 115 U. S. 674, 29 L. ed. 525, 6 Sup. Ct. Rep. 273, 81 Pa. 85.

The Pennsylvania Railroad Company is fully authorized to become the guarantor of the debentures issued by the Bedford & Bridgeport Railroad Company. Act of March 17, 1869 (P. L. 11).

The prohibitions have no application unless there be a railroad. They do not apply to a thing merely projected or authorized. The entire article of the Constitution relates to highways in fact. Cf. §§ 1, 3, art. 17, Const.

Under a charter or franchise to make a road only, a lease cannot be made of a road already built. SHARSWOOD, J., in Wood v. Bedford & B. R. Co. 8 Phila. 95.

"And the question whether railroads or canals are parallel or competing lines shall, when demanded by the party complainant, be decided by a jury, as in other civil issues." Const. 1874, art. 17, § 4.

Where the fact of competition and being parallel was denied, the county court denied the injunction, and the supreme court affirmed the decree, remarking, in such a state of facts the case should stand over to final decree, and no preliminary injunction should be awarded. Gyger's Appeal (1885) 15 W. N. C. 513. See also McCallum v. Germantown Water Co. 54 Pa. 40, 93 Am. Dec. 656; Shipley v. Continental R. Co. 13 Phila. 128.

"Lines of railroad" refer to the line owned as contradistinguished from lines leased or operated under traffic agreements. State v. Vanderbilt, 37 Ohio St. 590.

The control of the purchase by the Pennsylvania Company is not the control of the shareholder in contemplation of law. Pullman's Palace Car Co. v. Missouri P. R. Co. 115 U. S. 588, 29 L. ed. 499, 6 Sup. Ct. Rep. 194.

That any relation lawfully assumed in nowise changes corporate powers and duties is illustrated further in the case of Pennsylvania R. Co. v. Sly, 65 Pa. 207.

If the right of property, incident to the lawful ownership of stock, is taken from the Pennsylvania Railroad Company, the Declaration of Rights is violated. Const. 1874, art. 1, § 10.

The reasoning in Com. *ex rel.* Atty. Gen. v. Pittsburg & C. R. Co. 58 Pa. 47, shows how this clause has been maintained.

There is an express intention in the present Constitution to preserve all laws existing prior thereto, and to save all contract rights previously accrued, although it would be now in conflict. Sec. 2, Schedule to Constitution; Perkins v. Slack, 86 Pa. 270.

Article 17, § 4, of the Constitution of 1874 does not include any influence arising from the ownership of stock. This is made apparent from the use of appropriate words in § 12 of article 16, where it was sought to include stock in the consolidation of telegraph companies.

It is to be read as limiting the application of prior lawful methods of securing lines of railroad. Acts of May 16, 1861 (P. L. 702); March 24, 1865 (P. L. 49); April 23, 1861 (P. L. 410); June 21, 1865 (P. L. 852).

If the Pennsylvania Company was the lawful owner of stock, its motives are not the subject of inquiry; it is a question of the exercise of a legal power. If that exists, it fulfils the law; if that fails, the motive is of no avail. Pender v. Lushington, L. R. 6 Ch. Div. 70; Pennsylvania R. Co.'s Appeal, 80 Pa. 290.

It is believed that the cases in this state are tempestuous in their expression that a preliminary injunction cannot undo that which has been completed before litigation. Such is the office of a final decree and of that alone. See the remarks of Judge Sharswood in Audenried v. Philadelphia & R. R. Co. 68 Pa. 375, 8 Am. Rep. 195.

*Lewis C. Cassidy,* Atty. Gen., and *Robert Snodgrass,* Deputy Atty. Gen., for appellee.—Findings of fact will not, in any event, be disturbed except for plain and palpable error; but where there is not even an attempt to criticise their correctness, they must be taken as conceded for all the legitimate purposes of this argument. Baltimore & C. Valley R. Extension Co.'s Appeal, 10 W. N. C. 530; Kisor's Appeal, 62 Pa. 428; Crowell v. James, 2 W. N. C. 176; Trexler v. Mennig, 2 W. N. C. 680.

A corporation can exercise no powers except those which are expressly conferred upon it or those which arise by necessary implication. Com. v. Erie & N. E. R. Co. 27 Pa. 351, 67 Am. Dec. 471; Northwestern Fertilizing Co. v. Hyde Park, 97 U. S. 666, 24 L. ed. 1036.

The power to purchase bonds and securities, contained in the act of 1870, does not include the power to purchase stocks. Securities and stocks are two distinct and well-recognized classes of property; and in the general and ordinary acceptation of the term securities would not include stocks, unless it be clearly so intended. Ogle v. Knipe, L. R. 8 Eq. 434; Hopkins v. Abbott, L. R. 19 Eq. 222.

The charter of the Pennsylvania Company was taken subject to the act of May 30, 1855, and the constitutional amendment of 1857, and was, therefore, liable to modification by either the general assembly or the constitutional convention, under the single restriction "that no injustice shall be done to the corporators." Pennsylvania R. Co. v. Duncan, 111 Pa. 352, 2 Cent. Rep. 551, 5 Atl. 742; Philadelphia & R. R. Co. v. Patent, 17 W. N. C. 198, 2 Cent. Rep. 554.

The corporate power of the Pennsylvania Railroad Company to purchase and hold the stock of any other railroad company, or to guaranty the bonds of any such company, has not been conferred by its special charter or any amendment thereto, but exists solely under general statutes applicable alike to all railroad corporations of the state. Act of March 17, 1869 (P. L. 11).

If the powers conferred by this act had been in the form of an amendment to its special charter, such powers could have been withdrawn unless founded upon a new consideration as the basis of a new contract. Johnson v. Crow, 87 Pa. 189.

The repeal or withdrawal of such powers could be effected, either by legislative action, or in the form of a constitutional provision subsequently adopted. Pennsylvania R. Co. v. Duncan, 111 Pa. 352, 2 Cent. Rep. 551, 5 Atl. 742.

The Constitution has modified the act so as to prohibit the acquisition of stock and securities with a view to control competing lines. Const. 1874, art. 17, § 4.

The opinion of the learned judge presents a clear interpretation of what is a parallel or competing line.

The Street Passenger Railway Cases cited do not touch the question, Judge MITCHELL expressly holding, in Gyger's Appeal, 15 W. N. C. 513, that "Article 17 of the Constitution, prohibiting the leasing of parallel and competing railroads and canals, did not apply to or include what are known as passenger railways."

The debentures are void because they are not authorized by the Bedford & Bridgeport charter. Act of March 31, 1868; P. L. 1870, p. 1860.

They are also void because they are fictitious increase of stock. Const. 1874, art. 16, § 7.

The consolidation of competing lines of railroad is against the public policy of the state, and will be restrained and set aside by a court of equity. Central R. Co. v. Collins, 40 Ga. 582; Hartford & N. H. R. Co. v. New York & N. H. R. Co. 3 Robt. 411; Thomas v. West Jersey R. Co. 101 U. S. 71, 25 L. ed. 950. See also Currier v. Concord R. Corp. 48 N. H. 321; Hooker v. Vandewater, 4 Denio, 349, 47 Am. Dec. 258; State v. Hartford & N. H. R. Co. 29 Conn. 538; State v. Vanderbilt, 37 Ohio St. 590; Tippecanoe County v. Lafayette, M. & B. R. Co. 50 Ind. 85; Stewart v. Erie & W. Transp. Co. 17 Minn. 372, Gil. 348.

The constitutional provision under consideration in this controversy is within the police power of the state, which cannot be bargained away and to which all charter contracts are subject.

"Irrevocable grants of property and franchises may be made, if they do not impair the supreme authority to make laws for the right government of the state; but no legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police." Stone v. Mississippi, 101 U. S. 817, 25 L. ed. 1079. See also Cooley, Const. Lim. *575, 576; Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. ed. 629; Com. v. Alger, 7 Cush. 84.

PER CURIAM:

Decree affirmed and each appeal dismissed, at the cost of the appellant.