UNITED STATES v. UNION PAC. R. CO. et al.

(Circuit Court, D. Utah. June 24, 1911.)

No. 993.

1. MONOPOLIES (§ 12*)—ANTI-TRUST ACT—CONTRACTS OR COMBINATIONS PROHIBITED.

To bring any transaction within the condemnation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), it must be a contract, combination, or conspiracy in restraint of international or interstate commerce, and this restraint must be substantial in character and the direct and immediate effect of the transaction complained of.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. CARRIERS** (§ 33*)—THROUGH JOINT RATES—OPTION OF CARRIERS TO ESTAB-LISH.

Prior to the passage of the Hepburn act (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1909, p. 1149]), in 1906, connecting railroads were free to adopt or refuse to adopt joint through tariff rates, and this freedom was not abridged, as between the Union Pacific Railroad Company and the Central Pacific Railroad Company, by either section 12 of Act July 1, 1862, c. 120, 12 Stat. 495, requiring the roads of such companies to be operated as one continuous line, so far as the public or the government are concerned, or section 15 of Act July 2, 1864, c. 216, 13 Stat. 362, which requires them to afford and secure to each equal advantages and facilities as to rates, time, and transportation, without discrimination.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86-90; Dec. Dig. § 33.*]

**3. MONOPOLIES** (§ 16*)—ANTI-TRUST ACT—COMPETING RAILROAD LINES—UNITING CONTROL.

In 1901 the Union Pacific Railroad Company bought stock of the Southern Pacific Company, which gave it practically a controlling interest, and the United States brought suit to enjoin the voting of such stock, on the ground that its acquisition was for the purpose of suppressing competition between the two companies in interstate commerce, and of monopolizing such commerce or a part thereof, in violation of Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200). At that time the Southern Pacific Company owned and operated a steamship line between New York and New Orleans, and rail lines from the latter place to the Pacific Coast, and by way of San Francisco to Portland, Or. It also owned and operated the line of the Central Pacific Railroad Company between San Francisco and Ogden, Utah, from which point it connected eastward with the line of the Union Pacific and also with another competing line. The main line of the Union Pacific extended from Omaha to Ogden, with a branch from Kansas City westward to a connection with the main line. It also, through subsidiary companies, owned and operated a line from a connection with its main line to Portland, and from there operated steamship lines to the Orient and to San Francisco. For through freight for the Pacific Coast originating east of its Missouri river terminals it was dependent on other roads, with which it there connected, and practically all of such freight for San Francisco was forwarded from Ogden over the Central Pacific line, 800 miles long, for which the Southern Pacific received about four-tenths of all the freight from Omaha or Kansas City westward. The rail and water line of the Union Pacific from Ogden to San Francisco by way of Portland was 1,700 miles long, its steamer service was irregular, and the amount of freight sent that way was negligible. The two companies were competitors to a small extent for Oriental business, for business from the Atlantic seaboard to Portland and vicinity, and also, through branches and connecting lines to and from other common points; but the total amount of such competitive business done by the Southern Pacific during the year ending in 1901 amounted to only 0.88 per cent. of its entire tonnage, and that done by the Union Pacific but 3.10 per cent. of its entire tonnage. While the Union Pacific maintained agents in the East to solicit business, it was chiefly from connecting carriers, and it received little more in freights for such business than did the Southern Pacific. *Held*, that the two roads were not substantial competitors for interstate or foreign business, in such sense that the purchase of the stock by the Union Pacific, for the purpose of giving it an assured connection with San Francisco, which it could control, constituted a direct restraint upon such commerce, in violation of the act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

4. MONOPOLIES (§ 24*)—ANTI-TRUST ACT—SUIT FOR VIOLATION.

The purchase by an interstate railroad company of a majority of the stock of another company operating a competing line affords no ground for the granting of an injunction under Anti-Trust Act July 2, 1890, c. 647, § 4, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3201), where such stock was sold prior to the suit.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

5. MONOPOLIES (§ 16*)—ANTI-TRUST ACT—VIOLATION.

The purchase by an interstate railroad company of stock of another company operating a competing line, where it was insufficient in amount to give control of its competitor, and no attempt was made to exercise such control, does not effect a combination in restraint of interstate commerce, in violation of Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

6. MONOPOLIES (§ 16*)—ANTI-TRUST ACT—CONTRACTS PROHIBITED.

A contract to strangle a threatened competition, by preventing the construction of an immediately projected line of railway, which, if constructed, would naturally and substantially compete with an existing line for interstate traffic, is one in restraint of interstate commerce, and in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

7. MONOPOLIES (§ 16*)—ANTI-TRUST ACT—CONTRACT BETWEEN RAILROAD COMPANIES.

The Union Pacific Railroad Company, through a subsidiary company, had projected and partly built a line of road between Salt Lake City and Los Angeles, when a controversy arose over a portion of the right of way through the mountains between that company and another, which also desired to build a road between the same points, which was finally settled by an agreement to unite and build a road in which each party should own a half interest, with a further agreement respecting rates on through business. The Union Pacific Company at that time owned a controlling interest in the Southern Pacific Company, which owned and operated a line through Los Angeles to San Francisco, and one from there to Ogden, near Salt Lake City. Held, that the new line, which was direct, and much more serviceable and convenient for the public, was not a natural competitor of the Southern Pacific Company with respect to business between Los Angeles and Salt Lake City in such sense as to constitute the agreement under which it was built a combination in restraint of interstate commerce, in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), nor was it unlawful thereunder, on the ground that it prevented the building of two lines, instead of one, it appearing that there was but one practicable route through the mountains, over which it was not feasible to construct two lines, nor because of the minor and incidental provisions relating to the exchange of business.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

8. MONOPOLIES (§ 24*)—ANTI-TRUST ACT—COMBINATIONS OR CONSPIRACIES IN RESTRAINT OF INTERSTATE COMMERCE.

Contracts entered into by a railroad company, not in themselves unlawful as in restraint of interstate commerce, in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200),

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

*held* not to evidence a combination or conspiracy to restrain such commerce, in view of evidence showing that they did not have such effect.

[Ed. Note.—For. other cases, see Monopolies, Dec. Dig. § 24.*]

Hook, Circuit Judge, dissenting.

In Equity. Suit by the United States against the Union Pacific Railroad Company, the Oregon Short Line Railroad Company, the Oregon Railroad & Navigation Company, the San Pedro, Los Angeles & Salt Lake Railroad Company, the Atchison, Topeka & Santa Fé Railway Company, the Southern Pacific Company, the Northern Pacific Railway Company, the Great Northern Railway Company, the Farmers' Loan & Trust Company, Edward H. Harriman, Jacob H. Schiff, Otto H. Kahn, James Stillman, Henry H. Rogers, Henry C. Frick, and William A. Clark. Decree for defendants.

This suit is grounded upon the anti-trust law of Congress approved July 2, 1890 (26 Stat. 209), to dissolve an alleged contract, combination, or conspiracy in restraint and monopoly of interstate and foreign trade between the Union Pacific Railroad Company, the Oregon Short Line Railroad Company, and the Oregon Railroad & Navigation Company on the one hand, and the Southern Pacific Company. the Northern Pacific Railway Company, the San Pedro, Los Angeles & Salt Lake Railroad Company, and the Atchison, Topeka & Santa Fé Railway Company on the other hand. Edward H. Harriman, Jacob H. Schiff, Otto H. Kahn. James Stillman, Henry H. Rogers, Henry C. Frick, and William A. Clark. through whom it is averred the combination was created or is maintained, are also made defendants.

The specific charges are: That in 1901 and subsequently the Union Pacific Company, acting by itself or through a subsidiary corporation owned and controlled by it, acquired a controlling interest in the capital stock of the Southern Pacific Company, for the purpose of directing its operations and suppressing competition theretofore existing between the two in interstate and foreign commerce and monopolizing the same; that in the same year it, with like purpose, acquired a majority of all the stock of the Northern Pacific Railway Company, and subsequently induced the San Pedro, Los Angeles & Salt Lake Railroad Company and its promoters, the defendant William A. Clark and his associates, to desist from constructing an independent line of railroad between San Pedro. Cal.. and Salt Lake City, Utah; that in 1904 the defendants Harriman. Schiff. Kahn. Stillman, Rogers, and Frick purchased stock of the Atchison, Topeka & Santa Fé Railway Company, of the face value of $30,000,000, and thereby secured the election of Frick and Rogers, who were directors of the Union Pacific Company, as members of the board of directors of the Santa Fé Company, and later, in the year 1906, the Union Pacific Company, through the Oregon Short Line, purchased stock of the Santa Fé Company, of the face value of $10,000,000; and that these purchases were so made for the purpose of eliminating competition of the Santa Fé Company and monopolizing for the Union Pacific Company interstate and foreign commerce. These and some other minor charges, which will be referred to later. are relied upon to establish conspiracies in violation of the act. The prayer is that the defendants, who purchased the stocks, be enjoined from voting or otherwise acting as owner of them, and the other corporate defendants be enjoined from permitting them to vote the stocks or paying dividends upon the same, and for general relief.

The answer puts in issue all the material averments of the bill, and the cause is submitted to the court for a final decree on the pleadings and proof. The essential facts are these:

Prior to 1901 the Union Pacific Company owned and operated a main line of railroad. extending from Omaha on the east to Ogden on the west, with a branch extending from Kansas City on the east. through Denver, to a connection with its main line at Cheyenne; owned the capital stock of the Ore-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gon Short Line Company, which operated a railroad extending from the main line at Granger, Wyo., to Huntington, Or.; and owned or controlled the capital stock of the Oregon Railroad & Navigation Company, which operated a line of railway extending from Huntington to Portland, where it connected with lines of steamships operated by it, running to some Oriental ports and to San Francisco. The steamship line across the sea had just been organized, and had not engaged in business until 1900 or 1901. It was neither organized nor equipped for general traffic, but only for transporting grain and flour originating on the line of the Oregon Railroad & Navigation Company in competition with the Northern Pacific and Great Northern Railroads. Its sailings were scheduled every 30 days, but were in fact irregular and uncertain. The tonnage of Oriental traffic over this line was infinitesimal compared to the total tonnage of the system, being only .083 of 1 per cent. of it. The steamship line from Portland to San Francisco was likewise an inadequate provision for any regular traffic and particularly transcontinental traffic. Its sailings were irregular and unreliable, so that the Union Pacific Company had under its ownership, or control through subsidiary lines, a transportation route, as just described, from Omaha and Kansas City to some Oriental ports and to San Francisco, by way of Portland.

The Union Pacific had connections at Omaha with the Chicago, Milwaukee & St. Paul, the Chicago & Northwestern, the Chicago, Burlington & Quincy, and other railways leading to Chicago, and connecting at that point with many, if not all, the great trunk lines leading to New York and intervening points. It also had connections at Kansas City with the Missouri Pacific, Wabash, Chicago & Alton, and other railways leading to St. Louis, and connecting there with trunk lines extending to New York and intervening points. It also had divers important feeding-in or branch lines along its route.

In 1901 the Southern Pacific Company owned or controlled a line of steamships operating between New York and New Orleans, and a line of railway extending from New Orleans, through Louisiana, Texas, New Mexico, Arizona, and California, to San Francisco, and thence through Oregon to Portland, with several branch lines along its route extending into tributary territory. It also owned all the capital stock of the Central Pacific Railroad Company, which owned the line of railway extending between San Francisco and Ogden and had a majority of the stock of the Pacific Mail & Steamship Company, which operated lines of steamships between San Francisco to and from Panama and Oriental ports; so that the Southern Pacific Company had a transportation route over land and sea extending from New York, via San Francisco, to two terminal points, Ogden, Utah, and Portland, Or. It also connected at New Orleans with the Illinois Central, Louisville & Nashville, Queen & Crescent, and other roads, which opened up to it the traffic of the Middle states, and owned a line of railway extending from New Orleans to Ft. Worth, Tex., and to connections there with roads leading to Colorado and Utah common points.

The Atchison, Topeka & Santa Fé Railway Company in 1901 owned or controlled a main line of railway extending from Chicago, through Illinois, Missouri, Kansas, Colorado, New Mexico, Arizona, and California, to San Francisco.

The Northern Pacific Railway Company in 1901 owned a line of railway extending from Lake Superior and St. Paul, through Minnesota, North Dakota, Montana, Idaho, Washington, and Oregon, to Seattle and the Pacific Coast, and through ownership of a controlling interest in the capital stock of the Chicago, Burlington & Quincy Railroad Company, which operated lines of road in Minnesota, South Dakota, Iowa, Illinois, Wisconsin, Missouri, Nebraska, Kansas, California, and Wyoming, it controlled the transportation of that company. The last-named company connected at several points with the Union Pacific, and was a natural and important feeder for it.

The San Pedro, Los Angeles & Salt Lake Railroad Company was organized in 1902 for the purpose of constructing a line of railway extending from San Pedro, Cal., across the states of California and Nevada in a northeasterly course, to Salt Lake City.

From El Paso, Tex., on the Southern Pacific line, the Texas & Pacific Railroad ran across the state of Texas to Texarkana, and there connected with

the rails of the St. Louis, Iron Mountain & Southern Railroad, which extended to St. Louis.    At St. Louis the last-named road connected with the Wabash, for the East, and the Missouri Pacific, for Pueblo, Colo., and there connected with the Denver & Rio Grande Railroad, which ran to Ogden. These last-mentioned roads constituted what is known as the Gould System, and, operating under one general management, swung around from a point on the Southern Pacific at El Paso to another point on the Southern Pacific at Ogden.    The last-named company constituted its only connection into California, and afforded its only opportunity for participation in transcontinental business.

In 1898 the Union Pacific Company, which had been in the hands of a receiver since 1893, was reorganized, and Mr. Harriman and his associates came into control.    They soon adopted and put into execution plans of a stupendous character for the rehabilitation and reconstruction of the road, involving an expenditure of many millions of dollars.    Apart from possible rights conferred by the acts of Congress approved July 1, 1862 (12 Stat. 489), July 2, 1864 (13 Stat. 356), and June 20, 1874 (18 Stat. 111 |U. S. Comp. St. 1901, p. 3577]), known as the "Pacific Railroad Acts," the Union Pacific Company had no independent right of co-operation by through route or joint rates with the Southern Pacific for the Pacific Coast trade, and in fact no other direct connection was open to it for that trade except the Southern Pacific road itself.    The Rio Grande and its allied lines and connections with trunk lines from the east at St. Louis was available to the Southern Pacific as a connection at Ogden for business for the Atlantic seaboard and Middle states.    To meet a menace occasioned by this situation and secure a reliable and permanent arrangement for Pacific Coast business, Mr. Harriman, acting for the Union Pacific Company, first tried to purchase from the Southern Pacific Company the old Central Pacific line, extending between Ogden and San Francisco, and, failing in this, entered into negotiations with C. P. Huntington in his lifetime for the purchase of a large block of the capital stock of that company, owned by him.    Being unsuccessful in this, he renewed his efforts to secure that stock from Mr. Huntington's heirs and devisees after his death, in 1900.    In this effort he had a competitor in George Gould, acting for the Gould interests.    It resulted, in 1901 and 1902, in the purchase for the Union Pacific Company of 900,000 shares, and these, with the shares of some preferred stock afterwards issued and taken by it, made a holding of a little over 46 per cent. of the total outstanding issue of Southern Pacific stock.    This was a holding sufficient, according to the usual conduct of corporate affairs, to insure to the Union Pacific Company control in the management of the Southern Pacific Company.

In 1901 the Northern Pacific Company acquired a controlling interest in the Chicago, Burlington & Quincy Railroad, which was a natural and actual feeder to the Union Pacific Company.    After an unsuccessful effort to secure from Mr. Hill, who acted for the Northern Pacific Company, a partial interest in that purchase, in order to insure a continuation of the fair and equitable relations which had theretofore existed between the Union Pacific and the Burlington roads, Mr. Harriman purchased for the Union Pacific Company a majority of the capital stock of the Northern Pacific Company, including in his purchase more of the preferred than of the common stock.    The preferred, by action of the board of directors of the latter company, was soon retired.    The Northern Securities Company was afterwards organized, and the common stock transferred to it.    Upon its dissolution in 1905, the Union Pacific Company was required to accept a part of the stock of the Great Northern Railway Company in lieu of some of its former holdings in the common stock of the Northern Pacific Company.    Harriman v. Northern Securities Co., 197 U. S. 244, 25 Sup. Ct. 493, 49 L. Ed. 739.    If the Union Pacific Company acquired any controlling or influential interest in the management of the Northern Pacific Company, these things resulted in the loss thereof.    Finally, in the years 1908 and 1909, holdings of the Union Pacific Company in Northern Pacific or Great Northern stock entirely ceased.

In 1904 the defendants Harriman, Rogers, Stillman, Frick, Kahn, and Schiff purchased for themselves as individuals $30,000,000 in par value of the common stock of the Atchison, Topeka & Santa Fé Railway Company, and

later in 1906 the Union Pacific Company invested $10,000,000 of its idle money in the preferred stock of that company. The individuals who purchased and owned the common stock secured the election of two of their syndicate, the defendants Frick and Rogers, as members of the board of directors of the Santa Fé Company. They were at that time also members of the board of directors of the Union Pacific Company. The holding of the last-mentioned company of $10,000,000 in the preferred stock of the Santa Fé Company was about 5 per cent. of the total outstanding stock of the latter company. This was all disposed of in 1909.

Some time after the acquisition by the Union Pacific Company of the Southern Pacific stock, the latter company became involved in a controversy with the Phœnix & Eastern Railroad Company, the owners of a short line of road in Arizona. Litigation ensued, and resulted in the sale of the Phœnix & Eastern Railroad to the Southern Pacific Company. About that time there was a consolidation of a short line of road (about 90 miles) in the northwestern part of California with the Southern Railway Company. This consolidation was made pursuant to the laws of the state of California.

Prior to 1890 the Union Pacific Company through its subsidiary company, the Oregon Short Line, constructed a line of railroad extending from Salt Lake City in a southwesterly direction to Milford, a point near the state line between Utah and Nevada, a distance of about 206 miles, and plans were made for an extension of the road further southwestwardly and ultimately to Los Angeles. Grading had been done at a heavy cost on this extension for a further distance of 117 miles, a part of the way being through a rugged and narrow defile in the mountain, when, on account of financial embarrassments culminating in the receivership of the Union Pacific and Oregon Short Line Companies, work had to be abandoned. In the meantime a tax deed purporting to convey title to the graded road had been secured by defendant Clark and his associates, who sought to construct a part of a line of railway projected by them between Salt Lake City and Los Angeles over it. This provoked proceedings in the Land Department and courts by the Oregon Short Line to assert its rights, which resulted favorably to its contention. Utah N. & C. R. Co. v. Utah & C. Ry. Co. (C. C.) 110 Fed. 879.

Pending subsequent controversies between the parties, an adjustment was reached whereby the two promoters, the Oregon Short Line and the Clark interests, proceeded jointly to construct and operate a single line, each taking one-half interest in the stock of the San Pedro, Los Angeles & Salt Lake Company, which owned and operated it. It was not completed, and no commerce passed over it, until 1905. In the further adjustment of their differences, certain permanent provisions relating to joint, through, and local rates were made, favorable to the interests of the Union Pacific Company and its allied roads as a system.

Prior to 1901 agents of the Union Pacific, Southern Pacific, and Santa Fé roads were actively engaged in New York and elsewhere in securing business between New York, Pittsburg, and interior points to the Pacific Coast. The Union Pacific Company, having no through route, had to depend upon connections with other roads at either end of its line, and to share with them the revenue resulting from the traffic secured in such proportions that out of the through rate it received but a minor part; for instance:

On traffic from New York to San Francisco, via Omaha and Ogden, it received of the through rate only...................... 34.4%
Its connections east of Omaha received.......................... 35.5%
And the Southern Pacific, from Ogden to destination, received.... 30.1%

On traffic from New York to San Francisco, via Kansas City and Ogden, it received of the through rate only................... 30.5%
Its connections east of Kansas City received..................... 38.6%
And the Southern Pacific, from Ogden to destination, received.... 30.9%

On traffic from Cincinnati to San Francisco, via Omaha and Ogden, it received............................................ 40.4%
Its connections east of Omaha received.......................... 24.4%
And the Southern Pacific, from Ogden to destination, received... 35.2%

On traffic from Chicago to San Francisco, via Kansas City and
  Ogden, it received of the through rate only..................... 43.6%
Its connections east of Kansas City received..................... 14.2%
And the Southern Pacific, from Ogden to destination, received... 42.2%

From these fairly illustrative instances it appears that, on transcontinent-
al traffic from New York and important interior points by way of the Union
Pacific road to San Francisco, the connections of the last-mentioned road on
both ends received practically two-thirds of the total freight rate; the
Southern Pacific itself receiving about the same proportion of it as the Union
Pacific did. On the other hand, the Southern Pacific received on freight
from New York common points to San Francisco by way of New Orleans on
its own route all the through rate, and on freight from Cincinnati, Chicago,
and other interior points to San Francisco via New Orleans the total through
rate less the small portion required by the initial carriers for transportation
from point of origin to New Orleans.

Many witnesses testified generally that the Union Pacific and Southern Pa-
cific were prior to 1901 competing lines for transcontinental business and had
separate soliciting agents in New York and elsewhere. The proof amply
shows that they were active in securing routings of freight and passengers
to California, but that they did it in two ways: One by direct solicitation of
shippers and passengers, and the other by securing and fostering friendly re-
lations with the initial carriers at the points of origin of the traffic. The
initial carrier commonly was able to and did determine the routing of all
traffic. Notwithstanding the right of the shipper in the abstract to do so,
the initial carrier practically settled the question so as best to serve its own
interest.

In so far, however, as the initial carrier was influenced by the shippers
and they by the soliciting agents, the result was this: As between the South-
ern Pacific and the Union Pacific, the agents of the former exercised their in-
fluence in favor of their through route by way of New Orleans; but, as be-
tween the Union Pacific and the Santa Fé, the agents of the Southern Pacific
exercised their influence in favor of the Union Pacific route, as it thereby
secured for itself a haul of 800 miles over its own road from Ogden to San
Francisco, the last connecting link into California.

The actuating intent and purpose of the Union Pacific Company in acquir-
ing the Huntington stock was to secure a permanent and reliable connection
at Ogden for through traffic over the Central Pacific line to the Pacific Coast,
and thereby to save the necessity for constructing a road of its own from
Ogden to San Francisco.

The facts relating to less important competition (1) between the Atlantic
seaboard and interior points on the one hand and Portland, Or., on the other,
(2) between the Atlantic seaboard and Colorado and Utah common points,
(3) between Portland and Utah, Colorado, and Nevada common points, (4) be-
tween San Francisco and Portland, (5) between San Francisco and Montana
and Idaho common points, and (6) between New York and interior common
points and the Orient, will be specifically referred to so far as necessary in
the opinion.

Frank B. Kellogg and Cordenio A. Severance (George W. Wicker-
sham, Atty. Gen., on the brief), for the United States.

N. H. Loomis, P. F. Dunne, and D. T. Watson (H. F. Stambaugh
and John M. Freeman, on the brief), for defendants.

Before SANBORN, VAN DEVANTER, HOOK, and ADAMS,
Circuit Judges.

ADAMS, Circuit Judge (after stating the facts as above). [1]
To bring any transaction within the condemnation of the first section
of the anti-trust law, it must be a contract, combination, or conspiracy
in restraint of interstate or international commerce. This restraint

must be substantial in character and the direct and immediate effect of the transaction complained of. Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, and cases cited. The most important feature of the complaint in this case, and the one chiefly relied upon by counsel for the government in support of their contentions, is the purchase in 1901 by the Union Pacific Company of a controlling interest in the capital stock of the Southern Pacific Company. Its consequences are alleged to have been the destruction or restriction of free competition in transcontinental commerce. Whether such consequences followed depends upon whether these companies were or could have been independent and substantial competitors before the transaction in question occurred. Kimball v. Atchison, T. & S. F. R. Co. (C. C.) 46 Fed. 888. Most obviously, if they were not and could not then have been such competitors, the securing of control of both by one did not destroy or stifle competition. Northern Securities Co. v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 679.

The question then is: Was the line of the Union Pacific Company, extending only from Omaha and Kansas City on the east to Ogden on the west a competing line prior to 1901 for transcontinental business with the Southern Pacific Company, whose line extended from New York on the east over the sea to New Orleans, and thence by rail to San Francisco and Portland on the west? The question is not whether it constituted a continuous line over which traffic might possibly be moved from the Atlantic seaboard or interior to the Pacific Coast, but whether it constituted a feasible route over which it could enter naturally and profitably into competition with the Southern Pacific route for that traffic.

Claim is not made that it was such a competitor for any business originating on or near to its main line, but only for business originating in New York or Pittsburg common points, 1,000 or more miles away from its line. Its traffic between New York and interior points, on the one hand, and Portland, Or., on the other, was of trifling importance, amounting for the fiscal year preceding the purchase of the Huntington stock to only 0.46 per cent. of its total tonnage. Accordingly its competitive relation to the Southern Pacific route with respect to traffic in and out of San Francisco, the chief gateway for transcontinental business, will first be considered.

It had a connection at Granger with its subsidiary lines, the Oregon Short Line and the Oregon Railroad & Navigation Line, extending to Portland, and there with a line of steamboats irregularly and infrequently running between that port and San Francisco. But this detour through Portland and over the sea was long, unreliable, and unsatisfactory, and afforded no opportunity for fair and remunerative competition with the Southern Pacific for San Francisco trade. It was about 1,700 miles in length, as against 800 miles in direct line from Ogden to San Francisco. In fact, prior to 1901 it had never been employed in any substantial way as an outlet for the Union Pacific's west-bound freight into San Francisco. It is inconceivable, therefore, that the Huntington stock was purchased to prevent, or had the

effect of preventing, in any substantial way, free competition with so devious and impracticable a route.

We shall accordingly dismiss it from further consideration so far as transcontinental business is concerned, and pass to the important question upon which argument was concentrated: Whether the right, privilege, or practice, whatever it may have been, of connecting with the rails of the Southern Pacific at Ogden and of using that company's line between Ogden and San Francisco, together with the right, privilege, or practice of connecting at Omaha and Kansas City with the lines of other railroads, which by themselves and by successive connections led to the points of origin of the traffic, constituted the Union Pacific a competitor of the Southern Pacific for that traffic. It is certain the Union Pacific by itself could do none of that business. It extended neither to its origin nor destination. It depended for success upon its connections with other railroads at the east and with its alleged competitor at the west end of its own line.

[2] Prior to the enactment of the provisions of the fourth section of the act of June 29, 1906 (34 Stat. pt. 1, p. 590 [U. S. Comp. St. Supp. 1909, p. 1159]) known as the "Hepburn Act," there was no way of coercing railroad companies into establishing through routes or joint rates with each other. In Southern Pacific v. Interstate Com. Com., 200 U. S. 536, 553, 26 Sup. Ct. 330, 334, 50 L. Ed. 585, the Supreme Court speaking of a time antedating the Hepburn act, said:

"It is conceded that the different railroads forming a continuous line of road are free to adopt or refuse to adopt joint through tariff rates. The commerce act recognizes such right, and provides for the filing with the commission of the through tariff rates, as agreed upon between the companies. The whole question of joint through tariff rates, under the provisions of the act, is one of agreement between the companies, and they may, or may not, enter into it, as they may think their interests demand. And it is equally plain that an initial carrier may agree upon joint through rates with one or several connecting carriers, who between each other might be regarded as competing roads. It is also undoubted that the common carrier need not contract to carry beyond its own line, but may there deliver to the next succeeding carrier, and thus end its responsibility, and charge its local rate for the transportation. If it agree to transport beyond its own line, it may do so by such lines as it chooses."

Whether, therefore, the great Eastern lines and their connections, which gathered up the west-bound freight, should favor the Union Pacific, the Southern Pacific, or the Santa Fé routes, as their final connection into San Francisco, was optional with them. If they favored the Union Pacific, the terms of their arrangement, whether for a reasonable participation by each in the through rates, or on the basis of local rates for the service of each, or otherwise, were not within the power of the Union Pacific itself to determine, or of the courts, in the absence of legislative authority, to enforce. If, perchance, the Union Pacific had for a time a voluntary arrangement with the Chicago, Milwaukee & St. Paul, the Michigan Central, and the New York Central for a through route and joint rates on traffic destined from New York common points to Ogden and thence to San Francisco, can it be true that that fact by itself would have constituted the Michigan Central a competitor of the Southern Pacific for

that traffic within the intent and meaning of the anti-trust law? If not, it does not seem to us that the Union Pacific Company, another intermediate link, like it, in the same temporary through route, could have been such a competitor. But we do not rest our conclusion on this feature of the case alone.

[3] In view of the fact that the Southern Pacific owned and operated the road from Ogden to San Francisco, with which alone (except for the circuitous and impracticable route via Portland and the sea to San Francisco) the Union Pacific could have connected, and over which alone it could have carried its traffic into San Francisco, we are unable to understand how the Union Pacific could have been an independent competitor with the Southern Pacific for business over that road into San Francisco. While the Union Pacific was entirely dependent upon the Southern Pacific for its connection westward, the Southern Pacific was not at all dependent upon the Union Pacific for its connection eastward. The Denver & Rio Grande Company and its allied lines under one control had a through route extending from Ogden, through Denver, Kansas City, and St. Louis, to Chicago and other interior points, and thence by many available connections to New York and the seaboard. This was obviously a most attractive and powerful rival of the Union Pacific Company, and a constant menace to its success. The latter was in no position to coerce any action by the Southern Pacific. Its hands were tied.

But, it is argued, it could retaliate by using its influence to induce initial carriers or shippers to route transcontinental freight by way of Portland and the sea to San Francisco. This being such a long and unreliable route, little success could have been reasonably expected in such retaliation. If the Rio Grande should have been favored by the Southern Pacific as its Eastern connection, the Union Pacific, in the language of the witnesses, would have been practically bottled up at Ogden. With the advantage possessed by the Southern Pacific as an initial carrier to deflect all east-bound traffic to another line at Ogden, and with the right to exact on all east or west bound traffic local rates, instead of a fair and just proportion of an established through rate, the Southern Pacific would easily have put a quick and decisive ending to any hostile rivalry or competition, if such had been hazarded by the Union Pacific. This absolute dependence by the latter upon the Southern Pacific for a distance of 800 miles of its only through route, to say nothing of its dependence upon the voluntary action of its Eastern connections already pointed out, in our opinion, rendered any equal or profitable competition between them impossible. No real rivalry in the nature of things could have subsisted as long as the success of one was dependent upon the consent or favor of the other. Instead of the situation being competitive, the two roads really acted together and co-operated between themselves and with their connections in securing as much of the transcontinental traffic, each for the other, according to their respective facilities, as they could get, and participated in the total revenue on a basis of comparative service rendered. Their relations were like those of a limited partnership, rather than those of hostile competitorship.

But it is said the Pacific Railroad acts, supra, obligated the Union Pacific and Central Pacific (the predecessor in right of the Southern Pacific so far as the road from Ogden to San Francisco is concerned) to the establishment of through routes and maintenance of joint rates, and take these roads out of the operation of the rule announced in the case of Southern Pacific Company v. Interstate Com. Com., supra. But we do not so interpret them. Those acts required the two roads, the one from Ogden east to Omaha and Kansas City, and the other from Ogden west to San Francisco, or their predecessors, to be "operated and used for all purposes of communication, travel and transportation so far as the public and government are concerned, as one continuous line" (section 12, Act July 2, 1862, 12 Stat. 495), and also required them in such operation and use "to afford and secure to each equal advantages and facilities as to rates, time, transportation, without any discrimination of any kind in favor of the road or business of any or either of said companies, or adverse to the road or business of any or either of the others * * *" (section 15, Act July 2, 1864, 13 Stat. 362).

The act of 1862 not only provided for the continuous operation of the roads, but empowered them to consolidate (section 16); and so likewise did the act of 1864 (section 16). These acts were obviously intended to secure a permanent physical connection between the roads and to provide generally for equal accommodations to the public on the basis of independent carriers; but we discover in them no provisions or machinery by which the Southern Pacific, as successor to one of them, could have been compelled by the courts or otherwise to make agreements governing interchange of traffic or through rates, or fixing the division of such through rates between the two roads. Section 15 of the act of 1864 is not substantially different, so far as the matter under consideration is concerned, from section 3 of the interstate commerce act of 1887 (24 Stat. 380). They both forbid discrimination in rates between connecting lines. Section 3 has been held by the Interstate Commerce Commission and by the Court of Appeals of this circuit not to invest the commission or the courts with power to compel carriers to make contracts or agreements for through billing of freight or for joint rates. On the contrary, it was held that such matters are left to the voluntary determination of the interested carriers. L. R. & Mem. R. R. Co. v. E. Tenn., etc., Co., 3 Interst. Com. R. 1; Little Rock & M. R. Co. v. St. Louis & S. W. Ry. Co., 63 Fed. 775, 11 C. C. A. 417. See, also, to the same effect, Oregon Short Line, etc., v. Northern Pacific R. Co. (C. C.) 51 Fed. 465, 474, and Chicago & N. W. Ry. Co. v. Osborne, 52 Fed. 912, 914, 3 C. C. A. 347.

The voluminous evidence of officers, agents, and shippers to the effect that active competition existed between the Union Pacific and Southern Pacific roads prior to 1901 must be considered in the light of the legal and physical relations of the roads to each other and of other related facts. Whether there was competition or not, in view of all these things, is a mixed question of law and fact, and not susceptible of determination by the preponderance of proof as an issue of fact only. Without doubt there was active competition, but

188 F.—8

it was chiefly in co-operation with initial lines, which had the routings of freight, and for the benefit of such initial lines and their connections to Omaha or Kansas City, as well as for the benefit of the Union Pacific Company itself. Even so far as it was for the benefit of the latter company, it operated necessarily for the benefit of the Southern Pacific to an extent of about eight-twentieths of the haul after the Union Pacific took it at Omaha or Kansas City. In this condition of things, the opinions of any number of witnesses as to whether the two were competing lines within the meaning of the law is of little aid, and the general statement of those witnesses that the two roads had separate soliciting agents throws little, if any, light upon the ultimate issue.

The immediate and actuating intent and purpose of the Union Pacific Company in acquiring the Huntington stock, and thereby the control of the operations of the Southern Pacific line, were, according to the proof, to secure a permanent working and reliable connection at Ogden over an existing road for its through traffic; a connection not dependent upon the grace of a dominant copartner, but one within its own control. We recognize the proposition that, if the necessary and direct result of the purchase of the Huntington stock was to destroy or substantially suppress free and natural competition, before then existing between the two companies, or if that purchase put it within the power of the Union Pacific Company to destroy or suppress such competition, the latter-named company would undoubtedly be held to have intended the natural and reasonable consequences of its act, and, notwithstanding the dominant purpose just mentioned, would have violated the anti-trust law. Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 234, 20 Sup. Ct. 96, 44 L. Ed. 136; Northern Securities Co. v. United States, 193 U. S. 197, 328, 332, 357, 24 Sup. Ct. 436, 48 L. Ed. 679.

Our conclusion is that all the facts of this case, considered in their natural, reasonable, and practical aspect, and given their appropriate relative signification, do not make the Union Pacific a substantial competitor for transcontinental business with the Southern Pacific in or prior to the year 1901. We therefore pass to a consideration of some less important matters relied upon by the government to establish destruction of competition between those companies.

It is contended that it was destroyed or suppressed in transcontinental business between the Atlantic seaboard and Middle states, on the one hand, and Portland and Willamette Valley common points, on the other hand. The route of the Southern Pacific for this business was by its own line via New Orleans and San Francisco to Portland, and that of the Union Pacific was by its own line from Omaha and Kansas City to Ogden, together with its connections and subconnections eastward from Omaha and Kansas City, and its subsidiary lines, the Oregon Short Line and Oregon Railroad & Navigation Company running northwestwardly into Portland and the Valley. The geographical relation of these routes to each other, and the dependence of one of them, at least, upon voluntary arrangements with other lines, would seem to render natural and fair competition between them for the Portland trade impossible; but the

slight volume of the traffic here involved affords a controlling and decisive consideration. For the year ending June 30, 1900, the tonnage of the Southern Pacific Company in this trade was only 0.10 per cent. of its total tonnage. For the same year the tonnage of the Union Pacific Company in this trade was only 0.46 per cent. of its total tonnage.

Again, it is contended that the control of the Southern Pacific Company acquired by the Union Pacific Company suppressed free competition between them for business between the Atlantic seaboard and Colorado and Utah common points. The route of the Southern Pacific available for this traffic was from New York to New Orleans or Galveston by sea; thence over its own line to Ft. Worth, Tex.; thence over its connection, the Colorado & Southern, to Denver; thence over another connection, the Denver & Rio Grande, into Utah.

The route of the Union Pacific Company available for it was its own line from Kansas City and Omaha to Denver and Ogden, with its numerous initial connections and subconnections, and also a line by sea from New York to Newport News and Savannah; thence by connections at those places with such railroads as would favor them through the interior of the country to the beginning of its own rails at Kansas City or Omaha.

Physically and practically speaking, in view of the circuity of the route of the Southern Pacific and of the necessary dependence of both companies upon volunteer connections, real rivalry between them for this traffic does not seem to have been possible; but here again the traffic itself was of little volume and comparatively unimportant. For the year ending January 30, 1900, the tonnage of the Southern Pacific in this business was only 0.19 per cent. of its total tonnage. For the same year the tonnage of the Union Pacific in this traffic was only 0.47 per cent. of its total tonnage.

A like contention is made concerning the traffic between San Francisco, on the one hand, and Portland and points in the Willamette Valley, on the other hand; but this traffic was also small. For the year ending June 30, 1901, the tonnage of the Southern Pacific in this traffic was only 0.36 per cent. of its total tonnage, and the tonnage of the Union Pacific Company in it for the same period was only 1.27 per cent. of its total tonnage.

A similar contention is made concerning the traffic from Portland and Willamette Valley common points, on the one hand, and Ogden and its common points, on the other. The route of the Southern Pacific Company for this business was by the so-called Shasta route from Portland to Sacramento, and thence via the old Central Pacific route to Ogden. This was a long and circuitous route, compared to that of the Union Pacific Company from Portland via Oregon Railroad & Navigation Company and Oregon Short Line to Ogden. Not only is this so, but the business was trifling. For the year ending June 30, 1901, the tonnage of the Southern Pacific in it was only 0.01 per cent. of its total tonnage, while that of the Union Pacific was only 0.35 per cent. of its total tonnage.

A like contention is made concerning traffic from San Francisco, on the one hand, and points in Montana, Idaho, Eastern Oregon, and

Washington, on the other hand, Without commenting upon the uncompetitive character of those routes for this business, it suffices to call attention to the insignificance of the traffic itself. For the year ending June 30, 1900, the tonnage of the Southern Pacific Company in it was only 0.02 per cent. of its total tonnage, while that of the Union Pacific Company for the same time was only 0.23 per cent. of its total tonnage.

Claim is also made that the control which the Union Pacific Company acquired by the purchase of the Huntington stock suppressed free competition between them for the Oriental traffic. Many considerations arising out of the relations of the two roads to the transpacific steamship lines which carried the traffic from the coast have conduced to the conclusion reached; but bearing in mind that we are not considering this case in view of the present Oriental traffic, but in view of what it was 10 years ago, when the transaction complained of occurred, we find adequate reason for it in the small amount of this business also. For the year ending January 30, 1901, the tonnage of the Southern Pacific in handling it was only 0.20 per cent. of its total tonnage, while that of the Union Pacific both through San Francisco and Portland gateways was only 0.41 per cent. of its total tonnage.

The aggregate of all the business done by the Union Pacific and Southern Pacific Companies over all these routes for the years specified, which we believe fairly represent the general conditions prevailing at or before the Huntington stock was purchased, was for the Southern Pacific Company 0.88 per cent. of the entire tonnage of that system, and for the Union Pacific Company 3.10 per cent. of its aggregate tonnage. Tables in evidence also disclose that the total revenue derived from the traffic over these minor routes by the Southern Pacific Company for the year preceding the year of the Huntington purchase amounted to only 1.25 per cent. of the total revenue of that system.

Certainly the desire to appropriate the trifling business done by the Southern Pacific Company on these minor lines, or to suppress a competition in traffic which was in the aggregate of such small proportions, could not have been the inspiration of the vast outlay involved in the purchase of the Huntington stock. Neither was the suppression of competition in this infinitesimally small proportion of the business of both companies a substantial or natural consequence of that important transaction. It did not amount to a direct and substantial restraint of either interstate or international commerce. It was at best only contingently, incidentally, and infinitesimally affected by it. This is not sufficient to bring it within the condemnation of the anti-trust law. United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300; Field v. Barber Asphalt Co., 194 U. S. 618, 24 Sup. Ct. 784, 48 L. Ed. 1142; Northern Securities Co. v. United States, supra; Cincinnati Packet Co. v. Bay, 200 U. S. 179, 26 Sup. Ct. 208, 50 L. Ed. 428; Phillips v. Iola Portland Cement Co., 61 C. C. A. 19, 12ᵤ Fed. 593; Arkansas Brokerage Co. v. Dunn & Powell, 97 C. C. A. 454, 173 Fed. 899; United

States v. Standard Oil Company (C. C.) 173 Fed. 177, and cases cited.

[4] This concludes consideration of the effect of the transaction chiefly relied upon by the government in this case. But it is contended that the purchase by the Union Pacific of a controlling interest in the stock of the Northern Pacific Company was also violative of the anti-trust law. Without dwelling on the reason for the purchase of this stock, disclosed in the preceding statement of facts, it is sufficient to say that, if any controlling interest was thereby acquired, it was lost some time before this suit was instituted, and that none of that stock is now held by or for the Union Pacific Company. As there is no showing of any like ambitious project in this respect for the future, we fail to discover any opportunity or reason for the injunctive relief on this account.

[5] The transaction of 1904, by which a syndicate of men interested in the Union Pacific Company purchased for their individual account $30,000,000 in face value of the stock of the Santa Fé Company, and the investment in 1906 of $10,000,000 by the Union Pacific in acquiring 5 per cent. of that stock are not claimed to have conferred any actual power of control upon the Union Pacific over operations of the Santa Fé Company. The proof does not disclose that any such control was acquired or attempted to be exercised. Even if the motive of the purchasers was to gain some inside information concerning the operations of the great competitor of the Union Pacific Company, they chose an entirely lawful way for doing it, and their acts afford no reason for judicial condemnation.

[6] Much of the argument relating to the construction of the San Pedro route is addressed to the proposition that, because the San Pedro line was not completed at the time the Huntington stock was purchased, and because there was no competition then existing between the roads in question, there could have been no contract. combination, or conspiracy in restraint of it. The contention of the government in this particular, that a contract to strangle a threatened competition by preventing the construction of an immediately projected line of railway, which, if constructed, would naturally and substantially compete with an existing line for interstate traffic, would be in violation of the anti-trust law, may well be conceded. United States v. Patterson (C. C.) 59 Fed. 280; Interstate Com. Com. v. Philadelphia & R. Ry. Co. (C. C.) 123 Fed. 969; Thomsen v. Union Castle Mail S. S. Co., 92 C. C. A. 315, 166 Fed. 251; Pennsylvania R. Co. v. Commonwealth, 3 Sadler (Pa. Sup. Ct. Cases) 83, 91, 7 Atl. 374.

[7] But this concession does not settle the question before us. The San Pedro line, as originally projected and as ultimately constructed, does not appear to have been naturally competitive with the Union Pacific, Southern Pacific, or any of the subsidiary lines. It is practically a continuation of the Union Pacific or Oregon Short Line southwardly, and, generally speaking, its course is at right angles, rather than parallel with, either the Union Pacific or Southern Pacific line. If it, as an existing route, had been acquired by the Union Pacific, it would have served rather as a short cut from Los Angeles to

Salt Lake City, to avoid the circuitous route between those points via San Francisco, than as a natural competitor for any of the business of that route. While it was calculated to deprive the Southern Pacific of a long haul on traffic destined between Los Angeles and Salt Lake City and beyond, it would be unfortunate indeed if that fact should have prevented its construction, especially when it was practically at right angles with the Southern line, and much shorter and much better adapted to serve the public. In these circumstances it, as projected and built, was not, in our opinion, naturally competitive with the Southern Pacific line, as alleged in the bill.

It is however, contended that in the adjustment of differences between the Union Pacific and its allied or subsidiary companies with the Clark interests, resulting in the construction of one line between Salt Lake City and Los Angeles, instead of two, as projected, there was a suppression of competition which would have existed between the two, if they had built separately. We, however, are unable to discover anything in the transaction except a laudable purpose to adjust differences and construct a line of railroad between the two points which would serve their joint interests as well as those of the public. The evidence discloses that it was not feasible to construct two lines of road over the only practicable route through the canyon in the mountains, known as "Meadow Valley Wash." This, with other reasons of a practical nature, fully justified the abandonment of the project of constructing two lines and the consolidation of them into one.

Some minor agreements fixing the relations between the new San Pedro line and the other lines composing the system of the Union Pacific, as well as the provisions for fixing through and local rates, were made; but these are so incidental to the main transaction, already found not to have violated the interstate commerce act, as to warrant no further consideration. If it be true, as already pointed out, that the San Pedro line was not naturally competitive with the Union Pacific or Southern Pacific lines, none of these incidental things would disturb legitimate competition within the purview of the anti-trust law.

The evidence discloses certain transactions between the Southern Pacific Company, on the one hand, and the Phœnix & Eastern and the California & Northwestern Railroad Companies, on the other hand, which are claimed to have been in restraint of competition between them; but as they affect local transportation only, and are not complained of in the bill as substantive wrongs, and as neither of the two last-mentioned companies are made parties to this action, it is not perceived how any independent relief with respect to them can be granted. We therefore refrain from considering them, except in so far as they afford relevant evidence on issues joined in the case.

[8] Having now found that the several contracts or transactions specifically complained of in this case did not offend against the anti-trust law, it seems hardly necessary to discuss the claim, little debated by counsel, that they evidenced a combination or conspiracy to do so. In determining whether a combination or conspiracy in violation of the first section of the anti-trust act, namely, to restrict competition and thereby restrain commerce, was entered into, the facts already

found may properly be supplemented by reference to actual consequences and results. These often reflect the original meaning and purpose of preceding transactions. The proof shows that after 1901, as well as before, the rates for transcontinental traffic were the same over both the Union Pacific and Southern Pacific lines, and that there has since then been with respect to either of these lines no impairment of service, no deterioration of the physical properties, no discontinuance of efforts to satisfy the public, and no complaints of shippers of any inferior or inadequate service.

The large number of initial carriers striving for that traffic have continued their active solicitation for business over the line which assured them the longest haul or otherwise benefited them most, and although some agents of the two roads, which before 1901 were separate, are now joint, they have continued to exercise their influence to secure business for either road according to its availability, and always in opposition to other active competitors, like the Santa Fé and Denver & Rio Grande roads. A substantial majority of the stock of the Southern Pacific Company has been held by parties other than the Union Pacific Company; but we fail to find any complaint by such holders of any discrimination against their road or of any failure to properly promote its welfare. None of the minor points charged to have been deprived of competitive opportunities by the Huntington purchase are shown to have suffered as a result of that purchase. On the contrary, hundreds of millions of dollars have since 1901 been expended on these roads. Their physical condition has been vastly improved, and their efficiency for public service as well as for private profit has been greatly enhanced. The whole proof, taken together, we think, fails to disclose any conspiracy to restrain interstate or foreign commerce, in violation of the first section of the act.

The same considerations lead to the conclusion that no combination or conspiracy to monopolize or attempt to monopolize trade or commerce among the states or with foreign nations was entered into. Moreover, the fact that the Union Pacific Company did not secure or undertake to secure the control of the Santa Fé road, a thoroughly sufficient, well-equipped, and powerful rival for transcontinental business, or the Denver & Rio Grande road, a potential, and later an actual, powerful rival for the same business, affords additional and conclusive evidence of no such combination or conspiracy. The purchase by the Union Pacific Company, soon after acquiring the Huntington stock, of a majority of the capital stock of the Northern Pacific Company, tends to the opposite conclusion; but, in view of the main reason for its acquisition and its disposition by the Union Pacific Company, we are indisposed to give to that purchase alone any considerable significance.

The conclusions of fact already stated dispose of this case without the necessity of determining the question, much debated in brief and argument, whether securing control of the Southern Pacific Company by purchasing stock of individual owners could in any view of the case have contravened the anti-trust law. On the facts of this case, with all their reasonable and fair inferences, we conclude that the government has failed to substantiate the averments of its bill.

Mr. Justice VAN DEVANTER, while a Circuit Judge, participated in the hearing, deliberation, and conclusion in this case, and he now concurs in this opinion.

The bill must be dismissed, and a decree will be entered to that effect.

SANBORN, Circuit Judge, concurs.

HOOK, Circuit Judge (dissenting). Briefly stated, the decision of the court, in which I am unable to concur, is that the Union Pacific and Southern Pacific Railroads, universally regarded as parallel in a broad geographical and legal sense, for about 2,000 miles, were not competitors in 1901 for transcontinental or other traffic, and therefore their merger in that year was not contrary to the Sherman antitrust act. I agree with the court upon the minor features of the case, including, in a general way, that of the control of the San Pedro line by the Union Pacific Company. The latter is much as if a railroad company, with a line from the west through Omaha or Kansas City to Chicago, should obtain control of a branch from Omaha or Kansas City to St. Louis. In the absence of a more direct competitive relation than appears here, the Sherman act should not be held to cover such tangential acquisitions.

But the chief complaint of the government is of an unlawful contract or combination in restraint of trade and commerce, by which the Union Pacific and Southern Pacific transportation systems are held under a single control, and competition between them is suppressed or destroyed. The combination was effected through the purchase by the Union Pacific of part of the capital stock of the Southern Pacific. Upon this two important questions arise. The first, which is one of law, is whether the purchase by one railroad company of corporate stock of another, less than the majority, but sufficient in amount according to the practical experience of men to enable the purchaser to dominate or control the policies and operations of the other, is a form of combination within the prohibitions of the Sherman act. The conclusion of the court being against the government on another ground, it was unnecessary to determine this question; but as I do not assent to the conclusion, and as the question lies at the threshold of the government's case, I should briefly express my view concerning it.

There is no substantial difference between the holding of the corporate stocks of two companies by a third, such as was condemned in the Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, and the holding by one of those two of the stock of the other. The form is somewhat different, but the effect, which is the chief concern of the law, is the same. If prior competition disappears as a direct and natural result, trade and commerce are restrained. If it is unlawful in the one case, it must be so in the other. It would be idle to hold that, while two competing railroad companies cannot lawfully submit to a common control through a separate stockholding organization, they may do so by dispensing with that medium. That would be regarding shadows and letting the substance go. The

language of the Sherman act in this particular is broad. It covers every contract and combination in restraint of interstate and foreign trade or commerce, *whether in the form of trust or otherwise.* The essential, effective character of the arrangement is to be regarded, rather than its casual vestiture; the substance, rather than the form. In Harriman v. Northern Securities Co., 197 U. S. 244, 297, 25 Sup. Ct. 493, 49 L. Ed. 739, it was assumed that the act could be violated by the direct holding of stock of a competing corporation.

I grant it is a serious thing to disturb a great business transaction like that shown in the case at bar; but, given the power of Congress to legislate, and clear words to express what a judge conceives to have been its purpose, his duty is plain, whatever he may think of the wisdom of the law. Even if public regulation is believed to be a wiser solution of the important economic problem than enforced competition, with its necessary wastes and burdens, nevertheless his judgment of a law embodying the latter policy should proceed as with distinct approval of its selection. It is quite clear that, with the growth and development of governmental regulation of common carriers engaged in interstate commerce, there is decreasing reason for holding them subject to the Sherman act, and it may be that as regards rates of transportation the Interstate Commerce Commission could perform its duties with equal justice to the public and greater justice to the railroads if they were released. . But certainly that is for Congress, not the courts. The judicial function is properly exercised when the Sherman act is construed and applied as though it were the only legislative remedy on the statute books.

The other question in the case is decided by the court against the government. It is whether the two great transportation systems, the Union Pacific and the Southern Pacific, were in a substantial sense competitors in interstate and foreign commerce. This question involves the relative location of their lines on land and sea, and not only the parts they actually performed, but also those they were naturally capable of performing, in the movement of traffic. Albeit in part within the domain of judicial knowledge, this seems to me to be a pure question of fact. Some hundreds of witnesses, practical railroad men and shippers of wide experience, testified upon it, and a great mass of evidence was taken, showing almost without dispute that, using the term "competition" as business men understand and use it, there was active, vigorous, and substantial competition between the Union Pacific and the Southern Pacific before the former obtained control of the latter. But the court holds the question of competition to be one of mixed law and fact, not determinable by the evidence alone, and as such it is answered against the government.

Roughly stated, the situation was this: In 1901, when the stock purchase was made, the Union Pacific had lines of railroad from the Missouri river, at Council Bluffs, Iowa, and Kansas City, Mo., to Cheyenne, Wyo.; thence a line through Ogden, Utah, to Portland, Or., lines of steamers from Portland to San Francisco, Cal., and from San Francisco and Portland to Oriental ports; also certain rights under an act of Congress (13 Stat. 356) with respect to the Central Pacific Railroad, which was controlled by the Southern Pacific, from

Ogden to San Francisco. At the Missouri river the Union Pacific had many connections with the principal cities of the country and the Atlantic seaboard by the roads of other companies directly interested in routing west-bound traffic by its line as against the Sunset Route, so-called, of the Southern Pacific. On the other hand, the Southern Pacific had a steamship line from New York to New Orleans, La., thence a railroad to Southern California and up through San Francisco to Portland, the above-mentioned railroad from Ogden to San Francisco, a steamship line from 'San Francisco to the Orient, and a steamship line from San Francisco to Panama, being the Pacific link of the Panama rail and water route from New York to San Francisco. The Southern Pacific also had at New Orleans connections similar to those of the Union Pacific by the roads of other companies directly interested in routing west-bound traffic by its line as against that of the Union Pacific. The most important competition, so termed by railroad men and shippers, between the two companies, was for transcontinental business. There was also active competition at intermediate points, where considerable traffic originated. The two companies were distinct in control, management, and operation, with separate officers, directors, traffic and operating officials, commercial agencies, and soliciting agents. Since the combination common officers and directors of traffic and operation were elected or appointed, competitive commercial agencies were consolidated or abolished, the activities of the two systems have been in close harmony, not in rivalry, and competition has disappeared.

Reduced to the simplest terms the conclusion of the court that the two companies were not competitors and the Sherman act was not violated is based on these two grounds: (1) Trade and commerce were not restrained, because before the combination the competitive interstate and foreign traffic of the two railroad companies was not a substantial percentage of their total traffic, including in such total the traffic entirely within the several states, over which Congress had no control. (2) Trade and commerce were not restrained because before the combination one of the lines of railroad, the Union Pacific, was 'an intermediate one in a through route, and depended for competitive traffic upon the business interests of connecting carriers, and therefore could not by itself alone, unaided by the concurrence of its natural allies, make a joint through rate over the entire route. In other words, each party to a contract or combination between railroad companies, which the government assails as being contrary to the Sherman act, must have owned or controlled an entire through route over which competitive traffic moved. That it may have performed an essential part, or have been a necessary factor, in the transportation, is insufficient. That connecting carriers may have voluntarily joined it in making through rates for the traffic is immaterial.

With the greatest deference to my Brothers, I am so profoundly impressed with the conviction that these conditions are without substantial relevance to the question before us that I am constrained to dissent from the opinion of the court. Moreover, their introduction so greatly narrows the act of Congress, which, however it may be

regarded, is the law of the land, that very little is left of it when applied to railroads. *Under one or both of those tests, the Union Pacific could probably have lawfully purchased control of all the great parallel railroad systems in the United States.* It could doubtless have been shown in most instances that the interstate and foreign traffic of each, for which it competed with the Union Pacific or with any of the others, was but a small percentage of its total traffic of all kinds, and we know that all of them depended upon connecting lines at least for transcontinental and much other traffic, and could not, unaided, have made joint through rates with respect to it. Nor is it clear that what could have been done in 1901 might not as well be done to-day. It is suggested that by the passage of the Hepburn act (June 29, 1906) Congress empowered the Interstate Commerce Commission to prescribe through routes and joint rates where connecting carriers have refused, and therefore a different rule respecting competition has since prevailed. I am wholly unable to perceive the material pertinence of that act, much less its controlling effect. The matter of compulsory joint rates is purely adventitious, except as business may be facilitated over a combined route. A joint through rate merely implies a single charge, less than the aggregate of the locals, for a continuity of transportation over two or more connecting lines. Carriers always had the power to make such rates, and commonly did so with allies of their own selection; but whether the traffic movement was under joint rates or combinations of local rates does not seem to me to determine the existence or nonexistence of competition. If rival lines or routes contended for the traffic, and it moved, by single line or by combination of connecting lines, there was competition. If not, it must be that until 1906, when the Hepburn act was passed, the Southern Pacific, with its through water and rail route from New York to San Francisco, never had a competitor for transcontinental traffic in any of the great railroad systems in the United States or in all combined.

The traffic for which the Union Pacific and Southern Pacific competed in 1901, and which one or the other secured, was of enormous volume when considered by itself. It ran into millions of dollars, and with the natural development of the country and the growth of commerce, reasonably to have been foreseen. it has since then greatly increased. The competition was direct, not incidental, and the business for which they strove was appreciable or substantial, not insignificant. But tables of figures are given by defendants from which it appears that the interstate and foreign traffic between competitive points secured by each was but a small percentage of the tonnage of its entire system, and it is therefore argued that the competition to which the act of Congress applies was relatively so small there could have been no restraint or suppression in a substantial sense, and hence no intent to restrain or suppress it. The comparisons being with the total tonnage of the railroads, obviously an element is included which is wholly beyond the power of Congress, namely, the traffic local to the states. The logical conclusion from this view must be that the Sherman act is not violated whenever the trade or commerce within its operation, affected by the contract or combination, however great in

volume, is overshadowed by that exclusively within the jurisdiction of the states. In other words, though substantial competition in interstate or foreign commerce has been actually suppressed, it must be held there was no intention to suppress it. The magnitude of the traffic shown by the proofs was too great, and the competition for it too earnest and active, to dismiss it as merely incidental to the principal business of the companies, and as not furnishing a motive for the merger or combination. A contention somewhat similar was made by defendants in the Northern Securities Case. It was there argued (193 U. S. 261, 262, 24 Sup. Ct. 436, 48 L. Ed. 679) that the entire interstate commerce of the two railroads, the Great Northern and the Northern Pacific, the rates on which could be controlled by them without other competition or consent of connecting lines, was less than 3 per cent. of their total interstate commerce, and that the restraint could not in any event affect more than that per cent. of their commerce of that character. The argument, however, was without avail.

In a broad and substantial sense, in the sense in which the terms are used in constitutions and statutes and in railroad and business circles, the Union Pacific and Southern Pacific lines were parallel and competing. That they were so regarded by practical men having to do with transportation in its various phases is shown, I think, by an overwhelming mass of evidence. But, had no witness testified regarding it, we should come to the same conclusion. There are occasions when courts in the exercise of their judicial functions are entitled to look out into the world of affairs to observe whether there is not a common knowledge of the subject before them, so universal and pervading as not to admit of testimonial controversy. That is termed "judicial notice," and it proceeds upon the assumption that a judge should not be blind to what all others see and understand. It embraces the great currents of trade and commerce in his country—the general movements of products and manufactures—as completely as it does the important features of its physical geography, the location of the cities, the ports, the navigable waters, and the lines of railroad.

The question whether a combination of two transportation lines is contrary to the Sherman act is not always to be reduced to a close consideration of the number of tons of competitive freight they carried within a given period, much less the precise relation of the competitive tonnage to their total business of all kinds. Were they, at the time of the combination, in a substantial degree competitive factors in interstate and foreign commerce? Were they so laid upon land and sea as inherently to possess a substantial competitive capacity for the movement of such traffic? It is not merely the extent to which that capacity was utilized yesterday, but the extent to which the transportation facilities were naturally capable of being utilized; and reasonable, not speculative, regard should be had for the developments of to-morrow. Were it otherwise, Congress in the making of laws would be denied that ordinary foresight which men engaged in business commonly possess and practice. Competition, as the antithesis of monopoly, is the influence which those in the same line of business have on each other, and that influence may as well be manifested in

an existing capacity and preparedness as in the degree of active exercise. A moment's reflection will show this is old doctrine in the judicial construction and application of laws against monopolies and restraint of trade. A railroad company may have great, if not controlling, influence on competition, regardless of the amount of the traffic it actually carries at the time. With a line of railroad scarcely less permanent than a navigable waterway, it stands equipped and ready to do the business when conditions arise, and the duty to do it comes from the very character of its corporate being and the source of its powers and franchises. It may at once be both a curb and a spur to other lines—a curb as regards rates, and a spur as regards quality of service, which are the two great points at which transportation touches the public interest. The influence of the Mississippi river and its navigable tributaries upon the trade and commerce of St. Louis is well known, yet of the enormous freight tonnage into and out of that city, largely interstate, scarcely one-half of 1 per cent. moves by water. To be more exact, of the total rail and river traffic in 1910, nearly 52,000,000 tons, but thirty-six hundredths of 1 per cent., was transported by water; in 1909, but sixty-seven hundredths of 1 per cent. of that year's tonnage. But who would contend that if the rivers were the subject of private ownership, instead of being common highways for the use of all, their control by a railroad company could not restrain trade or commerce because, as measured by relative percentages, the competition appeared to be so slight?

When the argument was made at the hearing that, because the Union Pacific was an intermediate, not a through line, it was not a competitor for traffic moving over it and its connections for which it could not have made a joint through rate, counsel admitted that the rule contended for would have made it lawful under the Sherman act for all intermediate lines in transcontinental transportation, such as the Chicago, Rock Island & Pacific from Chicago to El Paso, the Atchison, Topeka & Santa Fé from Chicago to Mojave (before it gained entrance to San Francisco). the Missouri, Kansas & Texas from St. Louis and Kansas City to Texas points, the St. Louis & San Francisco from St. Louis and Kansas City to the Southwest, the Missouri Pacific with the Denver & Rio Grande from St. Louis to Ogden, and the Union Pacific to have combined and agreed among themselves, as was done in the Trans-Missouri Freight Association Case, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, if they confined their combination to transcontinental traffic; in other words that those intermediate railroads could not be competitors for the traffic, and a confederation with respect thereto could not be unlawful. It seems to me that a statement of the contention shows its unsoundness. Anything that affects the rate over a substantial part of a transportation route is calculated to affect the charge as an entirety; and so of the other features of railroad competition. The competition of the all-water route by the Atlantic and Pacific Oceans with the all-rail transcontinental routes in the United States is so fully recognized that it is safe to say almost every car load rate to the Pacific coast from the territory between the Missouri river and the Atlantic seaboard exhibits a recognition of its influence. And yet it is contended that the

Union Pacific in the direct line of traffic movement, with 1,000 miles of railroad from the Missouri river to Ogden, and nearly 900 miles thence to Portland, with its steamship lines, is not a competitor for transcontinental traffic.

The practical aspect of the question is shown by the cases in which railroad companies have asserted the existence of competition from rival lines or routes of transportation as evidencing conditions justifying discriminations and preferences under the interstate commerce act—that the rates objected to as discriminative *were controlled by competition,* and if they abandoned the rates they would lose the business. An instance of this appears in Texas & Pacific Railway v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940. The Texas & Pacific Railroad from New Orleans to El Paso, Tex., and the Southern Pacific Railroad thence to San Francisco, formed a through route over which traffic, both foreign and domestic, moved. The Texas & Pacific Company successfully defended its right to charge and receive more for its proportion of the through rate on traffic originating in New Orleans than it charged and received on import traffic originating in London and Liverpool and billed through New Orleans over the same route to San Francisco, and it did so on the ground asserted that the rate from the English cities to San Francisco was determined by competition with the following routes: By vessel around the Horn; by vessel and by rail across the Isthmus of Panama; and (162 U. S. 216, 16 Sup. Ct. 674, 40 L. Ed. 946) by vessel and by rail across Canada. Were all those transportation agencies subject to the laws of the United States, could it with reason be urged that a contract or combination between them, suppressing a competition which actually existed, would not contravene the Sherman act, because all but one of them were composed of connecting links severally owned or controlled? If that which men engaged in transportation recognize as substantial competition in shaping their policies and their conduct is not so regarded in the courts, the statute will not have the operation intended by its enactment. Laws are generally framed to apply to the everyday affairs of men, who are not given to the study of nice differences and distinctions, and that should always be borne in mind in determining their meaning.

But it is said there was no competition, because the Union Pacific depended upon the Southern Pacific line from Ogden to San Francisco. It is true that much of the transcontinental traffic of the Union Pacific went that way; but it is not unusual for railroad systems to connect at points and interchange business, though they are active competitors in other respects. In fact, a large proportion of them are so related. Competition, within the laws which seek to preserve it, does not imply absolute nonintercourse, as between hostile armies, which exchange no prisoners and give no quarter. Moreover, the use of the Ogden line was neither a necessity to the Union Pacific nor a pure favor or concession by the Southern Pacific. Aside from the mutual benefits from the interchange of traffic, the former had its own line from Ogden, by way of Portland, which, though not as desirable, was more than an important strategic advantage necessary to be reckoned with. But were all this otherwise, the undeniable fact remains,

after stripping the case of all debatable considerations, that the Union Pacific secured this west-bound traffic by active competition, and had transported it as competitive for 1,000 miles before it reached Ogden.

I think that upon the main feature of the case the government is entitled to a decree.